R. P. Scott, Appellee, v. Mundy & Scott et al., Appellants.

**FRAUDS, STATUTE OF:** Sale of Personal Property—Part Payment
1, 4 **by Discharge of Pre-Existing Debt.** An oral purchase of personal property, without delivery, may be taken out of the statute of frauds by a payment in the form of a discharge by the vendee of a pre-existing debt which he holds against the vendor, *provided such discharge is evidenced by a written receipt or memorandum, or by some proper book entry.*

**PARTNERSHIP:** Authority of Partner—Admissions After Dissolution.
2 A partner may not, *after the dissolution of the partnership,* bind the other partners by admissions in pleadings. So held where it was claimed that a contract within the statute of frauds was proven . by the admissions of the partner in an answer.

**EVIDENCE:** Presumptions—Laws of Other States. On the issue
3 whether a contract for the purchase of an interest in a lease of oil · lands in a foreign state was within the. statute of frauds, it will

be presumed, in the absence of pleading and proof, that the laws of such foreign state are identical with the laws of this state.

*Appeal from Marshall District Court.*—JAMES W. WILLETT, Judge.

JANUARY 17, 1922.

OPINION ON REHEARING JUNE 23, 1922.

ACTION for an accounting, and to enjoin defendants Mundy & Scott from disposing of plaintiff's interest in certain notes, mortgages, and oil leases. The court awarded the plaintiff the relief prayed for, and the defendant Mundy appeals. The facts appear in the opinion. Plaintiff is referred to as appellee, and defendant Mundy as appellant. Superseding the opinion in 186 N. W. 207.—*Affirmed in part; reversed in part.*

*F. L. Meeker, Edwards, Longley, Ransier & Harris,* and *Senneff, Bliss, Witwer & Senneff,* for appellant.

*E. N. Farber, F. E. Northup,* and *C. H. E. Boardman,* for appellees.

*Thos. H. Smith, Amicus Curiae,* on rehearing.

FAVILLE, J.—Mundy & Scott was a copartnership, composed of M. L. Mundy and R. W. Scott. The appellee R. P. Scott is the brother of the said R. W. Scott.

In August, 1919, the appellee commenced this action in equity, alleging that the partnership of Mundy & Scott was about to be dissolved, and alleging that the said partnership had borrowed from the appellee the sum of $200, which had been repaid, except the interest, and on said date also borrowed the sum of $500, which had been repaid, except the interest. The appellee also alleged that said partnership held a mortgage of $1,475.63, in which said mortgage the appellee owned an undivided one-third interest. Appellee also alleged that, in April, 1918, said partnership borrowed from the appellee the sum of $150, no part of which has been paid; also that, in August,

1918, the said partnership borrowed from the appellee the sum of $500 cash, which was repaid on March 11, 1919, but that no interest had been paid thereon; also that, in January, 1919, the partnership borrowed from the appellee $400 in cash, which was repaid on March 11, 1919, but that no interest has been paid thereon. It was alleged that, on September 12, 1918, the appellee acquired by purchase from the said partnership, acting through R. W. Scott, an interest in a certain oil lease on real estate located in the state of Oklahoma, for which he paid the sum of $250. The petition further alleges that, on or about January 10, 1919, the appellee acquired an interest in another oil lease on real estate located in Oklahoma, for which he paid the sum of $72.01, and alleges that said interest "was acquired through and in conjunction with the said firm of Mundy & Scott." The petition alleges that Mundy & Scott should be credited with the sum of $250 paid by appellee for the interest in the first lease referred to, and that this sum of $250 "should be charged to the plaintiff in the accounting." By an amendment to the petition, the appellee seeks to recover cash dividends that are alleged to have been paid to the firm of Mundy & Scott since the commencement of the action.

To this petition, the appellee R. W. Scott filed a joint answer, in behalf of himself and also in behalf of the firm of Mundy & Scott, in which he admits each and every allegation of the petition.

The appellant, M. L. Mundy, also filed a joint answer, in his own behalf and in behalf of the copartnership of Mundy & Scott, which, with certain admissions immaterial to the final decision of the cause, was a general denial of the allegations of the petition. Said Mundy, in behalf of the said copartnership of Mundy & Scott, also filed a cross-petition against the appellee, seeking to recover about $1,400 for office rent. M. L. Mundy also filed a cross-petition against his copartner, R. W. Scott, alleging that, if any alleged sales of any interest in the said oil leases had been made by R. W. Scott to R. P. Scott, the same were wrongfully, unlawfully, and fraudulently concealed from the said Mundy; and that, if the court should find R. P. Scott entitled to any interest in said leases or profits arising there-

from, then and in that event, the said R. W. Scott is primarily liable therefor. He prayed that, in the event the court finds that R. P. Scott has an interest in the said leases, it be decreed that his said interest be established against the interest of R. W. Scott therein, and that the latter be held primarily liable for any judgment for proceeds arising from said leases, and that the said R. W. Scott be decreed to be liable to the said Mundy for any money that the latter may be required to pay to the plaintiff in said action.

A reply to the answer and an answer to the cross-petition were filed.

It appears from the record that R. P. Scott and R. W. Scott are brothers. They are single men, living in the same home, and their relations are and have been close and intimate. R. P. Scott is known in the record as Ray Scott, and R. W. Scott is known as Ralph Scott. The firm of Mundy & Scott was engaged in the real estate and general trading business at Marshalltown. Ray Scott is a lawyer at Marshalltown, and occupied the same office as the firm of Mundy & Scott.

The court awarded the appellee in the action an accounting as to certain items, of which no complaint is made on appeal. But two matters are involved in this appeal: First, the question of the right of the appellant to an accounting in regard to the oil leases, and if so, the effect thereof; and second, whether the court erred in refusing to allow appellant to recover on the cross-petition for office rent.

The oil leases referred to were on two different tracts of land, one known in the record as the "120-acre lease," and the other known as the "40-acre lease." In regard to the alleged purchase of an interest in the 120-acre lease, the appellee Ray Scott testified as follows:

"The transaction was with R. W. Scott individually. My understanding was that it was originally procured by him for the firm. The first of that week, R. W. Scott returned from Oklahoma, and stated that he had purchased this lease for 120 acres. Mr. Mundy stated in my hearing that Mr. Dobie, who lived in Oklahoma, was interested in oil leases, but stated that he [Mundy] did not know anything about the oil industry,

and did not want to know anything about it; and on the same
day, or the day following, Mr. Ralph Scott was talking to me
about going into that proposition, and taking one half of what
he had procured, agreeing that I should pay $250. That agree-
ment was talked over and gone into down in the grand stand
of the county fair grounds, where the fair was on that week.
He asked me if I would go into it on that basis, and I told him
that I would. I told him that the firm of Mundy & Scott had
borrowed considerable money of me; that, in fact, they had bor-
rowed $500 just two or three weeks before this date of Septem-
ber 12th: and I said that he could use that five hundred, or any
other money which they had which belonged to me, and that was
the agreement. * * * I told R. W. Scott that they could simply
take $250 of what they owed me, and apply it on the indebted-
ness to me; and in the accounting which I am asking between
myself and the partnership, I am willing that the sum of $250
should be charged to me and credited to this partnership, as
a part of the accounting.''

Objections were interposed to all of this testimony on va-
rious grounds, it especially being urged that the transaction
was within the statute of frauds.

The $500 loan mentioned in this evidence is referred to in
the appellee's petition as having been made on August 9, 1918;
and it is alleged therein that the principal of said loan ''was re-
paid on March 11, 1919.''

In the petition, interest is asked on the said sum of $500
from August 9, 1918, when it is alleged the loan was made, to
March 11, 1919, when it is alleged the loan was paid, which
amount was awarded by the court in the decree.

It appears that neither the appellant nor the appellee keep
any regular books of account. The business of Mundy & Scott
was largely a real estate business, and was carried on without
keeping any very definite records. None of the parties made
any entries in any books or executed any written memoranda
regarding the transfer of the oil leases. The entire transaction
rested in parol.

Appellee claimed in his petition that, prior to September
12, 1918, he had an interest in a certain note and mortgage.

This interest the court established by its decree. It is not disputed on appeal.

It is urged in behalf of the appellant that, at the date of the alleged conversation between the Scott brothers at the fair grounds, the firm of Mundy & Scott was not owing the appellee Ray Scott to exceed $66.44.

Appellee claims that he had an interest with Mundy & Scott in the mortgage referred to, held by the firm, and therefore that the said firm was owing him, on September 12,.1918, more than the $250 which was the alleged consideration for the purchase of the interest in the 120-acre oil lease.

In view of our conclusions, we do not deem it necessary to decide this fact question, but assume, for the purpose of this opinion, that, on September 12, 1918, the firm of Mundy & Scott was indebted to the appellee to the extent of $250 or more.

The evidence is not clear and certain as to the amount that the firm of Mundy & Scott had paid for their interest in the 120-acre lease, but we think it is fairly to be inferred from the evidence that it represented an investment of $1,500.

At no time until August, 1919, did the appellee Ray make any claim to appellant, Mundy, that he had acquired any interest in either of the oil leases, although, during a large part of said period of time, he occupied the office with Mundy & Scott, and frequently saw both of said parties.

About the middle of April, 1919, oil was struck upon the leased land, and shortly thereafter, dividends were realized on the investment. At the time of the trial, approximately $17,000 had been paid in dividends upon the shares of Mundy & Scott in the two leases. Some of these dividends came to the office occupied by all of the parties, in two checks, one payable to Ralph Scott, and the other to Mundy; and the evidence shows that the appellee Ray saw these checks and the letter accompanying the same, and that he personally knew that the dividends received were divided equally between the appellant, Mundy, and Ralph Scott. At said time, the appellee Ray made no claim whatever to any interest in said oil leases.

On July 1, 1919, Mundy & Scott dissolved partnership, and entered into a written memorandum of dissolution. This memo-

randum was prepared by Ralph Scott, and executed by him and Mundy, and provided that the interest of Mundy & Scott in the said oil leases was to be added to the interest of one Dobie, and from the total interest, Dobie was to receive one half, and Mundy and Ralph Scott, one fourth each. Nothing was said by Ralph to Mundy, at any time prior to the bringing of this suit by Ray, with regard to his having sold any interest in said leases to the appellee.

There is also evidence to the effect that, in the spring of 1919, the appellee had a conversation with one Smith in regard to the oil leases, and that at said time the appellee stated, in effect, that it was too bad that he did not go in with Mundy & Scott on the oil leases, but that he had bought a farm near Whiting, out of which he would make as much money as if he had gone in on the oil. well. The appellee denied having had any such conversation with Smith.

After the firm of Mundy & Scott was dissolved, the appellee, some time in August, first claimed to Mundy that he had any interest in the oil leases, or in the dividends received thereon.

I. The first question for our consideration is whether or not the alleged contract of sale between the appellee and R. W. Scott is within the provisions of the statute of frauds.

1. FRAUDS, STATUTE OF: sale of personal property: part payment by discharge of pre-existing debt.

All of the parties to the action treated the so-called "oil leases" as personal property. The question at this point is whether or not the transaction, as testified to by the appellee, by which he claims he acquired an interest in the "120-acre lease," is within the prohibition of the statute of frauds.

Code Section 4625 provides as follows:

"Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent:

"1. Those in relation to the sale of personal property, when no part of the property is delivered and no part of the price is paid."

Assuming that, at the time of the conversation between the

brothers at the fair grounds, the firm of Mundy & Scott was indebted to the appellee to the extent of $250 or more, and that the parties orally agreed, in consideration of the sale of an interest in the said oil leases, that the said indebtedness to the extent of $250 should be "discharged," the question at this point is whether or not, under such a state of facts, the alleged contract of sale is within the statute of frauds.

It is conceded that, in the instant case, "no part of the property was delivered." We have, then, for determination the single question, "Was any part of the purchase price paid?" To put the inquiry in another form, it is this:

"Is an oral agreement to discharge an existing indebtedness in consideration of a sale of personal property sufficient to remove said transaction from the statute of frauds, where no receipt or written memorandum is made by either party and no entry of credit made upon any of the books of the purchaser and no charge made upon any of the books of the seller?"

While the statutes of frauds of the various states differ in their phraseology, they are quite uniform in the provision with respect to the matters under consideration: to wit, that "part payment of the purchase price of a sale of chattels removes the contract from the provisions of the statute of frauds." In many cases, and in some of the statutes, this is referred to as the payment of "earnest money." Our statute refers to it as payment of "part of the price." It is, in legal effect, the same thing as earnest money. In fact, the Uniform Sales Act (Chapter 396, Acts of the Thirty-eighth General Assembly), which took effect after this transaction occurred, speaks of it, in Section 4, as "something in earnest to bind the contract." Can such earnest money be paid by an oral promise to discharge an existing debt, without the execution of any writing whatever in relation thereto by either party?

*Walker v. Nussey*, 16 Meeson & Welsby 302 (21 Eng. Ruling Cases 18), is the leading case on the question. It was decided in 1847. Goods were purchased under an oral agreement that credit was to be given for an existing indebtedness as a part payment thereof. The English statute (29 Car. 2, Chapter 3, Section 17) provides that:

"No contract for the sale of any goods, wares, or merchandises, for the price of ten pounds sterling or upwards, shall be allowed to be good, except the buyer shall accept part of the goods so sold, and actually receive the same, or give something in earnest to bind the bargain, or in part of payment, or that some note or memorandum in writing of the said bargain be made and signed by the parties to be charged by such contract, or their agents thereunto lawfully authorized."

The court held that there was no part payment, within the statute of frauds. No receipt was given for the debt, and everything rested on a mere verbal contract, which the court held to be insufficient.

In *Brabin v. Hyde,* 32 N. Y. 519, it is said:

"The payment may be made in money or property, or in the discharge of an existing debt, in whole or in part, due from the vendor to the purchaser, or the extinguishment of or payment upon a promissory note held by the latter against the former. A mere agreement to apply the purchase money to either of these objects would not be enough, because the contract would still rest in words, and nothing more. * * * And if the purchase money is to be applied to pay an open account, in whole or in part, the creditor and purchaser should part with some written evidence of such application, which shall bind him and put it into the power of his debtor and vendor to enforce the contract. Without this, or something like this, the contract is a mere collection of words, and the statute evaded."

In *Ely v. Ormsby,* 12 Barb. (N. Y.) 570, the plaintiff held a mortgage of $500 against defendant for borrowed money, and bought of the defendant a span of horses for $300, which amount was orally agreed to be applied upon the mortgage, but had not, in effect, been so indorsed. No note or memorandum of the sale was made, and no delivery of the property had. The court held that words alone would not answer the requirement of the statute.

In *Walker & Rogers v. Malsby Co.,* 134 Ga. 399 (67 S. E. 1039), it is said that the statute applies except where the buyer gives something in earnest, to bind the bargain, or in part payment. The court said:

"The agreement to give a credit for the price of the shingle mill on the notes is not a satisfactory part payment, unless a receipt to that effect was given, or the price was actually credited on the notes, or other memorandum of the fact was made by the original vendor."

*Galbraith v. Holmes,* 15 Ind. App. 34 (43 N. E. 575), involved a sale of wheat. An outstanding bill of $109.40 on open account was to be credited. The court said:

"Anything, however small in value, which is given in earnest or part payment will take the transaction out of the statute. But an agreement to apply a precedent debt in payment will not relieve the transaction from the operation of the statute, unless a receipt or credit is actually given."

In *Gorman v. Brossard,* 120 Mich. 611 (79 N. W. 903), the sale of stone was involved. The consideration was the cancellation of a debt due from the vendor to the vendee. The court said:

"Nothing occurred except mutual promises, — words, merely,—and the question is whether that was such a payment as comes within the statute."

It was held that it was within the statute, there being nothing given by way of earnest money in part payment.

In *Sharp v. Carroll,* 66 Wis. 62 (27 N. W. 832), wheat was purchased, and the note of the seller was delivered to him in part payment thereof. An agreement to surrender a claim or give a credit in payment or part payment for the thing purchased is not satisfactory. The court said:

"The surrender must actually be made, or the credit given."

In *Milos v. Covacevich,* 40 Ore. 239 (66 Pac. 914), the court said:

"If payment is relied on, it must be made in money or property, or in the actual discharge, in whole or in part, of some antecedent debt. A mere agreement to apply the purchase money on the debt will not suffice, because the contract would still rest in words, and nothing more. There must be an actual cancellation and discharge of the indebtedness on the books of the creditor, or a written receipt executed by him, or some other like unequivocal act, not resting in mere words, which will

bind him, and put it into the power of the debtor to enforce the contract.''

*Johnson v. Tabor,* 101 Miss. 78 (57 So. 365), involved the purchase of a horse and mare for $175. There was no change of possession. The purchaser gave the seller credit on account for the $175, and also a receipt therefor. The court said:

''The term 'purchase money,' as used in this statute, means simply the compensation or consideration which the seller is to receive for the property'' (citing *Devin v. Himer,* 29 Iowa 297). The court also said:

''The credit given appellee upon his indebtedness, his actual discharge from any further obligation to pay the same to the extent of the agreed value of the property, constituted a payment of the purchase money.''

In *Norwegian Plow Co. v. Hanthorn,* 71 Wis. 529 (37 N. W. 825), the credit was actually made. The court said:

''Giving such credit, if made in good faith, is as much a payment for them as though the money had been paid over for them.''

In *Young v. Ingalsbe,* 208 N. Y. 503 (102 N. E. 590), sale was made of a half interest in a law library, and credit given by the purchaser on account; but the court held that this was not sufficient, because the credit was not made at the time of the agreement, and the deceased (seller) was not in any way an actor in regard to it.

In *Walrath v. Richie,* 5 Lansing (N. Y.) 362, A owned a mowing machine, and was indebted to B, and proposed verbally that B should take the machine in satisfaction of his indebtedness, to which B verbally assented. The court said:

''Nothing was done whatever between the parties to show any application of the price of the machine to the payment of the indebtedness. Everything remained as it was before, except the verbal bargain. This will not do.''

In Story on Sales, Section 273 a, the rule is thus stated:

''Where a sale of goods is made on an agreement that the price shall be applied to the payment of the precedent debt, such price must be actually applied, by receipt or otherwise, in order to bring it within the exception in the statute.''

As bearing on this proposition, see, also, *Mahan v. United States*, 16 Wall. (U. S.) 143; *Matthiessen & W. Ref. Co. v. McMahon's Admr.*, 38 N. J. Law 536; *Dow v. Worthen*, 37 Vt. 108; *Teed v. Teed*, 44 Barb. (N. Y.) 96; *Pitney v. Glen's Falls Ins. Co.*, 65 N. Y. 6; *Artcher v. Zeh*, 5 Hill (N. Y.) 200; *Gaddis v. Leeson*, 55 Ill. 83; *Paine v. Fulton*, 34 Wis. 83; Wood on Statute of Frauds 523; Brown on Statute of Frauds (5th Ed.) 462.

The great weight of authority, in construing the statute of frauds, in so far as the same relates to the sale of personal property, is to the effect that the "part payment" required to take an oral contract out of the provisions of the statute cannot be made by the mere oral agreement to discharge an existing indebtedness. The cases generally recognize that the actual discharge of an existing indebtedness is a sufficient "part payment" to comply with the requirements of the statute of frauds, but that such discharge of an existing indebtedness must itself be evidenced by writing. In other words, a mere oral agreement to discharge an existing indebtedness does not comply with the requirements of the statute of frauds that part of the purchase price must be paid. With great unanimity, the courts hold that, where such a discharge of an existing indebtedness is relied upon as part payment, the fact of the discharge must be evidenced in writing. This may take the form of a receipt or an entry in the books of account of the proper parties, or some written memorandum; but the discharge cannot rest wholly in parol.

It is contended that, regardless of the decisions of other courts, we are committed to the proposition that the mere agreement to discharge an existing indebtedness is sufficient to comply with the provisions of our statute of frauds requiring part payment of an oral contract for the sale of personal property.

In *Brown v. Wade*, 42 Iowa 647, we said:

"There is great doubt as to the first branch of the instruction, that a mere agreement that $20 which Davis owed Brown should go on the sale as a part of the purchase money would constitute part payment, and render the sale valid."

We considered this question somewhat in *Peake v. Conlan*, 43 Iowa 297. That was an action for replevin of a horse. The

plaintiff alleged that he was the absolute and unqualified owner of the horse, which had been wrongfully taken by the defendant. The defendant pleaded ownership in himself, and stated that he had acquired the property by trading another horse for it to the plaintiff. It appeared that, by the contract between the parties, the plaintiff was to receive another horse for the one in controversy, and a debt of $15 owed by the defendant to the plaintiff "was discharged, as a part of the consideration in the exchange." The defendant, at the time, was authorized by plaintiff to take possession of the horse; and we held that this amounted to a delivery of the animal, and that the defendant's debt was, by the contract, paid or canceled on that date. We said:

"This feature of the transaction, performance at the time the contract was made, takes it out of the statute of frauds, which is relied upon to defeat the contract."

Nothing appears in the record in regard to the manner in which the debt was "discharged." The question now before us, as to whether or not the discharge of a pre-existing debt, in order to constitute part payment within the statute of frauds, must be in writing, was not apparently considered in the case. We recognized the rule that the discharge of an existing indebtedness is a sufficient part payment to remove the contract from the statute of frauds, but we did not determine in that case how such "discharge" of the existing debt must itself be evidenced. In other words, the question as to whether or not such discharge could rest in parol, or must be evidenced in writing, was not involved in the case.

In *Hotchkiss v. Cox*, 47 Iowa 655, is involved a contract for the sale of real estate. It was claimed that certain parties had relinquished a claim on the property in consideration of the payment of debts of the decedent, who formerly owned the property. We said:

"It is insisted by plaintiff, however, that a parol agreement would not, in any event, be sufficient to divest their interest in the property. But if the plaintiff and her husband agreed to relinquish their interest in the property in consideration of the discharge of the plaintiff's husband's indebtedness

to his father, and in consideration of his expense to his father in his last sickness (and the evidence shows that the father took his son in his last sickness into his house, and kept him until he died), it appears to us that the agreement, although resting in parol, was valid.''

In *Kerr v. Yager*, 158 Iowa 69, action was brought for the partition of certain real estate. We said:

''The satisfaction and release of· a pre-existing debt is a sufficient consideration for a conveyance, and amounts to such payment as to take the case. out of the statute of frauds. See the *Hotchkiss* case, supra. If Yager's case depended upon a parol gift, which must, to be sufficient, be followed by actual possession, if not by the making of improvements thereon, we should have more difficulty with it.''

It is apparent from these cases that we have recognized the rule that the discharge of a pre-existing debt does remove a parol contract from the provisions of the statute of frauds. We are not disposed to depart from the rule so announced. But the question in the instant case goes further than the mere recognition of this general rule.

Granting that the discharge of a pre-existing debt is a sufficient part payment to satisfy the requirements of the statute of frauds, the question still remains as to how such discharge or ''part payment'' must be evidenced. It is quite apparent, under the authorities, that there must be something more than a mere oral agreement to discharge the pre-existing debt, in order to obviate the provisions of the statute. Our former cases recognize that the actual satisfaction and ''discharge'' of a pre-existing debt are sufficient ''part payment'' to avoid the statute of frauds; but our previous· cases do not hold that such discharge can rest wholly in parol. The concurrence of authority is that it cannot. We are disposed to follow the general trend of the authorities that have passed upon this question.

We hold that an agreement to discharge a pre-existing debt is a sufficient part payment to. remove a parol contract for the sale of personal property from the statute of frauds; but we also hold that the discharge of such pre-existing debt, in order to be available as proof of part payment under the statute of

frauds, must be evidenced in some manner by writing, either by written receipt, memorandum, book entry, or otherwise, so that it does not rest wholly in parol.

Applying this rule to the instant case, it follows that the oral agreement claimed to have been entered into between Ray Scott and Ralph Scott at the fair grounds, whereby an undivided interest in the oil lease referred to is claimed to have been sold for a consideration resting solely on a parol agreement to discharge a pre-existing debt, was within the provisions of our statute of frauds, and the objections of the appellant to the oral testimony to establish such agreement should have been sustained. It is conceded on all hands that this agreement rested wholly in parol; that no receipt, book entry, or written memorandum was ever made in regard to the same by either party; that no part of the property was ever delivered; that none of the dividends or other proceeds derived from the property were ever turned over to the appellee; nor was any other act or thing done between the parties, further than the mere oral agreement to discharge a pre-existing debt.

This was insufficient to remove the bar of the statute, and we fail to find in the record any competent evidence to establish the alleged sale of an interest in the said oil lease on the 120 acres.

II. Appellee contends that the alleged oral contract for the sale of an interest in the oil leases was established by the admissions of Ralph Scott in the answer which he filed in behalf of the firm of Mundy & Scott. Ralph Scott testified as a witness in the case, but offered no testimony whatever regarding the contract for the sale of an interest in the oil leases to his brother. The answer which he filed in behalf of Mundy & Scott was filed after the partnership had been dissolved. In this answer, he admits each and every allegation of the petition.

2. PARTNERSHIP: authority of partner: admissions after dissolution.

The appellant, Mundy, also filed an answer in behalf of the partnership of Mundy & Scott, and in this he denied each and all of the allegations of the petition.

Upon this state of the record, appellee contends that the oral contract was established by the admissions contained in

the answer filed by Ralph Scott in behalf of the former firm of Mundy & Scott.

We regard the rule as well established that, after the dissolution of a partnership, the admissions of one partner are not competent to bind the other partner. That would seem to be especially true in a case like the one at bar, where the appellee is seeking to establish an oral contract by the admission of one partner in an answer filed by said partner purporting to be in behalf of the firm; and where, at the same time, the other partner has also filed an answer purporting to be in behalf of the partnership, in which the allegations respecting the oral contract are specifically denied. The authorities seem to be quite uniform on the proposition that one partner, after the dissolution of the firm, cannot, by admissions of this character, bind his former partner. *Brayley v. Goff*, 40 Iowa 76; *Miller v. Neimerick*, 19 Ill. 172; *Smith v. Allen*, 7 Ala. App. 397 (62 So. 296); *Owings & Piet v. Low*, 5 Gill & J. (Md.) 134; *Pringle v. Leverich*, 97 N. Y. 181; *In re Malschick*, 217 Fed. 492; *First Nat. Bank v. Strait*, 65 Minn. 162 (67 N. W. 987); *Bell v. Morrison*, 1 Peters (U. S.) 351; *Burdett v. Greer*, 63 W. Va. 515 (60 S. E. 497); *Tassey v. Church*, 4 Watts & Serg. (Pa.) 141; *Thompson v. Bowman*, 6 Wall. (U. S.) 316; *Brady's Admr. v. Hill*, 1 Mo. 315; *Boor v. Lowrey*, 103 Ind. 468 (3 N. E. 151); *Harwell v. Phillips & B. Mfg. Co.*, 123 Ala. 460 (26 So. 501); *Ballou v. Skidmore*, 132 Ky. 342 (113 S. W. 441); *In re Estate of Moore*, 52 Mich. 112 (17 N. W. 718); *Tate v. Clements*, 16 Fla. 339 (26 Am. Rep. 709); *Wilson v. Torbert*, 3 Stewart (Ala.) 296; *Hamilton v. Summers*, 12 B. Mon. (Ky.) 11.

We hold that the admissions of the partner, Ralph Scott, in the answer filed by him after the dissolution of the partnership, purporting to be filed for and in behalf of the partnership, were not binding upon his former partner, Mundy. The statute of frauds could not be and was not obviated by this pleading in the case.

Appellee relies upon *Southwick & Wheelock v. McGovern*, 28 Iowa 533, as holding to the contrary. The question before us in the instant case was not involved in that case. The question in that case was whether the plaintiff had reasonable

grounds to believe the existence of a partnership, and the evidence offered was held admissible on that question. An entirely different situation is presented by the case at bar.

III. The appellee contends that the appellant cannot avail himself of the statute of frauds of this state; that it was necessary for the appellant to plead and prove the statute of frauds of the state of Oklahoma; and that this was not done.

3. EVIDENCE: presumptions: laws of other states.

As before stated, all of the parties to this action treated the alleged sale of an interest in the oil leases as the sale of personal property. The leases themselves were not offered in evidence, and there is no proof in the record as to the length of time that they ran, or the character of the interest, if any, that was acquired in real estate thereunder. The appellee is seeking to establish an oral contract by which he claims to have purchased an interest in these so-called oil leases. The suit is brought in this state to establish such alleged sale and recover thereunder. Our statute of frauds (unlike that of many of the states) expressly provides that no evidence of certain contracts is competent unless in writing. In this state, it is essentially a matter that pertains to the proof.

It is also a well established rule in this state that the law of another state is presumed to be as the law of this state, in the absence of proof to the contrary. *McMillan v. American Exp. Co.*, 123 Iowa 236; *Shaffer v. Bolander*, 4 G. Greene 201; *Dorr Cattle Co. v. Des Moines Nat. Bank*, 127 Iowa 153; *Knight v. Moline, E. M. & W. R. Co.*, 160 Iowa 160; *Johnson v. Chicago & N. W. R. Co.*, 91 Iowa 248.

Under this rule, the law of the state of Oklahoma is presumed to be the same as the law of Iowa, unless proven to be different.

Under the record, the statute of frauds of this state was controlling in the case, and appellant could rely thereon when the alleged oral contract was asserted against him. *Barbour v. Campbell*, 101 Kans. 616 (168 Pac. 879); *Boone v. Coe*, 153 Ky. 233 (154 S. W. 900); *Heaton v. Eldridge*, 56 Ohio 87 (46 N. E. 638); *Third Nat. Bank v. Steel*, 129 Mich. 434 (88 N. W. 1050); *Downer v. Chesebrough*, 36 Conn. 39; *Leroux v. Brown*, 12 C.

B. 801 (138 Eng. Rep. Reprint 1119, 14 Eng. Law & Eq. Rep. 247); *Emery v. Burbank*, 163 Mass. 326 (39 N. E. 1026).

IV. Appellee contends that, in any event, he is entitled to the relief sought in regard to the oil rights and the oil lease that are referred to as the lease on the "40-acre tract." The

4. FRAUDS, STAT-
UTE OF: sale of
personal prop-
erty: part pay-
ment by dis-
charge of pre-
existing debt.

contention is made in argument that, under the record, a resulting trust was created in favor of the appellee, in so far as this oil lease is concerned. The allegations of the petition are that the appellee had had certain business transactions with the partnership and the members thereof, "whereby money was loaned by the plaintiff to said defendant partnership, property was acquired in common by the plaintiff with said partnership, and various other obligations were incurred and transactions had by and between the plaintiff and said defendant partnership, all of which have been consummated, closed, and settled for, except as hereinafter stated."

With respect to the particular lease in question, the allegation is as follows:

"That on or about January 10, 1919, the plaintiff acquired an undivided 13/112 interest in certain other oil rights and oil lease on real estate located in Okmulgee County, state of Oklahoma, and described as follows, to wit, the Northeast Quarter of the Northeast Quarter of Section 7, Township 14, Range 12, for which he paid the sum of $72.01, and which interest was acquired through and in conjunction with the said firm of Mundy & Scott, and which lease is held by and in the name of the defendant D. L. Dobie."

The petition throughout seeks an accounting from the firm and a decree fixing appellee's interest in the oil leases referred to. Regarding the transaction as to the so-called 40-acre lease, the appellee testified that:

"On or about the 1st of January, 1919, R. W. Scott informed me of their intention to lease another 40 acres right beside the other 120, and that it had been determined that the same owners of the lease on the 120 acres should purchase the 40, and asked me if that was all right with me, and I told him that it was."

He further testified that his brother told him that he would go ahead and pay the amount himself, and that thereafter he paid to his brother $72.01. He also testified that he was informed that this lease was to be held by a Mr. Dobie as trustee, the same as the other; that he saw the instrument issued by Dobie to R. W. Scott; that, when the dividends were sent on, they were made payable, one to R. W. Scott and one to M. L. Mundy, which he saw; that there had been dividends paid to Mundy & Scott on account of these leases; and that he had made demand on the partnership for a settlement of said matters.

On cross-examination, the appellee testified that he did not pay the $72.01; that it was simply a credit which he told his brother to give him; that no money changed hands. He said:

"All I knew about where the 40 acres was situated was what Ralph told me; but I understood *that the firm* had acquired an interest in this other 40 acres, and I claim I am entitled to one half of the interest that they acquired."

He later stated:

"There was no firm transaction about the $71.01 [$72.01]. I kept the matter between Ralph and myself. The $250 was a firm transaction, because they owed me considerable more than that. The firm of Mundy & Scott had nothing to do with the $71.01 [$72.01]."

There was no dispute in the record that the partnership acquired the interest in the 40-acre lease, and that the dividends received therefrom were divided between the members of the partnership.

Upon this record, the appellee is hardly in a position to contend, as he does now before this court, that a resulting trust existed in his favor in the 40-acre lease. Under his own testimony, if any such resulting trust did arise, it could not be enforced against the firm of Mundy & Scott. His own evidence is that the transaction was with his brother alone, and that the firm of Mundy & Scott had nothing to do with it. He further concedes that he made no payment whatever, but had an oral agreement with his brother that he was to be given credit for the $72.01 which it is claimed was his proportionate share of the purchase price of this lease. The appellee, upon the rec-

ord made, is in no position to claim a resulting trust in this oil lease which was purchased and owned by the firm of Mundy & Scott, nor is he entitled to an accounting from the said firm of Mundy & Scott for dividends received on said oil lease, nor for an assignment of an interest therein. He stands in no better position in regard to the 40-acre lease than he does in regard to the 120-acre lease. What recourse, if any, he may have against his brother is not involved in this action.

We reach the conclusion that, as to the accounting sought by the appellee against the firm of Mundy & Scott in respect to the two oil leases and the proceeds derived therefrom, the court was in error in allowing the appellee the relief prayed for, and that an accounting as to said items should have been denied.

V. By cross-petition, the appellant seeks to recover from the appellee $1,440, as rental for the use of the office of the firm. We are disposed to accept the conclusion of the trial court at this point, and to deny the appellant the relief sought in the cross-petition as to said rental.

Except in the manner heretofore indicated in this opinion, the decree of the trial court appears to be correct, under the record in the case. The cause will be remanded, with instructions to enter a decree in accordance with this opinion; or the parties may have a decree entered in this court, as they may elect.

The decree of the district court is—*Affirmed in part; reversed in part.*

STEVENS, C. J., WEAVER and EVANS, JJ., concur.