GEORGE W. FAIRALL, Appellee, v. ROSE SEIBERT ARNOLD, Executrix, and O. A. BYINGTON, Administrator, Appellants.

No. 44593.

MAY 2, 1939.

Popham, Toomey & Davis, for appellee.

Byington & Rate, for appellants.

BLISS, J.—Nancy W. James, the wife of William Henry James, died testate on January 2, 1925, leaving all of her property, including the real estate in question, to her husband, who qualified as the executor of her estate. The property involved herein is a residence property, referred to as the Johnson street property, located at 215 South Johnson street, in Iowa City. It was her individual property and was purchased with money received from her people. George W. Fairall, the plaintiff, was a brother of Mrs. James, and there is evidence that during the several months she was ill, just prior to her death, the plaintiff was at the James' home, more or less steadily, engaged in doing various kinds of work. The estate was never closed. Sometime in the summer or fall of 1925, William Henry James moved to California, and, except for occasional visits to Iowa City, lived there until his death on April 11, 1937. He died testate, leaving all of his property, including the Johnson street property, to Rose Siebert Arnold. She was not a relative of Mr. or Mrs. James.

In his petition the plaintiff alleged that the services rendered by him were at the request of his sister and her husband, and with their verbal agreement, and the expectation, on his part, that these services would be paid for; that he was never paid for his work; that about six months after his sister's death, he

demanded payment of James, and informed him that if he were not paid, he would file a claim for his services against the estate of his sister, and would insist upon the payment thereof by the estate and its executor; that James orally replied that he knew the services had been rendered and had not been paid for, and that he would pay if he had the cash, and that if the plaintiff would refrain from filing his claim against the estate, and would not insist upon the payment of it at that time, that if he did not convey the Johnson street property to the plaintiff prior to his death, that he would provide in his last will that this real estate should become the property of the plaintiff; the plaintiff, in reliance upon said promise, orally agreed with James to refrain from filing his claim against the estate, and from insisting upon its payment at that time by the estate or by James; that he has ever since so refrained and forborne; and that James failed to convey said property to him, in his lifetime, and failed to devise it to him by will. He prayed for a decree directing the defendants to convey the property to him. Upon the court's ruling on defendant's motion to make his petition more specific, he alleged the value of his services was $760.

The defendants answered, denying the claim, and alleging lack of consideration, that it was barred, because not in writing, by the statute of frauds, and particularly, by paragraph 3 of section 11285, of the Code of 1935; that it was barred by the statute of limitations, as provided in section 11007 of said Code, and by the laches of the plaintiff.

To establish his claim the plaintiff introduced the records in the clerk of court's office, in the Nancy W. James estate, to show that no claim had been filed therein by him, and also offered the testimony of C. B. Russell, Mrs. Libby Carlson, and Miss Anna Kutcher.

Russell was a lawyer, 48 years old, since deceased, who had attended school at the State University, and had practiced law at Iowa City since about 1919. He was a friend of the Jameses, a visitor at their home, and a pallbearer at the funeral of Mrs. James. He was employed by Mr. James, executor, as the attorney of her estate. He testified that about six months after her death, knowing that James was going to move to California very shortly, he went to his home one evening to obtain some data for a report in the estate; that as he concluded his talk with James, the plaintiff came into the dining room, from the

kitchen, and in the presence of the witness, and within the hearing of Mrs. Russell and a friend in an adjoining room, stated to James that he ought to be paid for the work he had done, and he always felt that his sister was going to leave him one of the properties, that that had been promised, and since nothing of that kind had been done, he wanted to file a claim in the estate, if they could not fix it up in some other way; that James stated that since he was the only beneficiary of the estate, he wished he would not file the claim; that the property was bought with his wife's money, and she had the right to do with it as she pleased, and he knew that she always intended to leave the plaintiff something, and if the plaintiff would refrain from filing anything, he would see that plaintiff would get that; that there was some further talk as to whether it would be deeded or how it was going to be made, and James suggested that the matter be left open until the estate was all settled, and that in the event he died before that time, he would protect him and would make a will and leave it to the plaintiff when he died, and if he never got around to deeding it to the plaintiff, he would be protected; that the property referred to in the discussion was the Johnson street property; and that he would call at the office of the witness (Russell) the following day and have his will drawn; that he never came to his office but left for California the next day and the witness never saw him afterward.

Mrs. Carlson testified that she knew both Mr. and Mrs. James very well and often came in to visit the latter during her illness; that after her death, she remarked to James that the plaintiff had helped him, and that he ought to will him one of the homes, and that James said that he would, because he could not forget him as he had been very kind to him and his wife.

In answer to very leading questions, Miss Kutcher, who was an old acquaintence of the Jameses, in relating conversations with each of them, over objection, testified:

"Well, she told me that George had done a great deal of work around the house for her and one thing another, she said she thought she would like to give him some money. She said she worried very much about him not having a home and that she wanted to give him the home on Johnson street and she

would give it to him if it was in her power to give it to him. She said she wanted him to have the home. * * *

"She said, yes, she wanted to leave him that piece of property. * * *

"Two years ago I said something to Billy James about that property. I said I thought you should leave George Fairall that house. He says I am thinking pretty strong of that myself and he says I will see about that."

All of these witnesses had seen the plaintiff working about the James home at times before the death of Mrs. James. The plaintiff testified that his services were worth $760. The inheritance tax appraisers valued the property at $2,500.

The plaintiff also testified to the matters testified to by Russell, and that he had heard the conversation between James and Mrs. Carlson, as testified to by her. Objections were made to the testimony of Russell, Carlson, Kutcher and the plaintiff that their testimony relative to any statement by James that he would convey or devise the property to the plaintiff was incompetent under the statute of frauds. Objections were also made to all testimony of the plaintiff as to communications or transactions with James or Mrs. James, because he was incompetent under section 11257 of the Iowa Code.

Defendants' motion to dismiss upon the grounds alleged in their answer, and because the plaintiff had failed to establish his case with the character and quantum of proof necessary, was overruled, and decree for plaintiff was made and entered as prayed.

As heretofore stated, this is an action in equity against Rose Siebert Arnold, as Executrix, and O. A. Byington, as Administrator with the will annexed, of the estate of William Henry James, deceased, and against Rose Siebert Arnold, individually, as the sole beneficiary under the will of the testator, for a decree directing the specific performance of a verbal contract between the testator and the appellee, wherein the testator agreed to transfer to the appellee, by deed or by will, the property in question, in consideration of the agreement of the appellee to refrain from filing against the estate of Mrs. James and insisting on the immediate payment thereof, of a claim for services rendered to Mr. and Mrs. James. Appellee claims that, although the oral contract was fully performed on his part, it

was breached by the failure of James to convey the real estate either by deed or by will.

The appellee did not ask decree because of the services performed by him, nor in consideration of the discharge of the debt which Mr. James and the estate of Mrs. James owed him for the performance of those services. He referred to them and introduced proof thereof only for the purpose of showing the background of his suit, his good faith in making the demand, and the probability of James having made the agreement. Appellee states his claim thus:

"This is not an action to establish a claim against an estate nor to collect a debt. It is a proceeding to compel specific performance of an oral agreement entered into in compromise of a right to have said claim determined by a court or jury. As far as the plaintiff's right to an order requiring specific performance of said contract sought to be enforced herein and set out in plaintiff's petition, it makes no difference as to whether or not the plaintiff could have established his claim against the estate of Nan W. James or against William Henry James. In a trial to establish a claim against either said estate or William Henry James, the court or jury might correctly have found that the plaintiff was not entitled to recover, and plaintiff might have entirely failed, but he had the right to contest his claim. In his compromise agreement with William Henry James he surrendered his right to litigate said claim or to have it adjudicated by a court or jury in consideration of the said William Henry James agreeing to convey said premises to him either by will or deed and the statute of limitations has now run against said claim."

To state it briefly, he claims that James agreed to deed or devise the property to him, in consideration of his agreement to not insist upon payment of the claim at that time, and to not file the claim against the Nan James' estate. He contends that he fully performed the agreement on his part by not pressing the claim for payment, and by not filing it against the estate, and that since James did not perform, on his part, his representatives should be required to do so.

Among other defenses, the appellants contend here, as they did below, that the agreement which the appellee seeks to enforce is an oral agreement for the transfer of an interest in

land, under subsection three of section 11285 of the 1935 Iowa Code, and that the ban of the statute is not removed by any of the exceptions, stated in section 11286 of said Code.

The appellee concedes that the agreement is within the statute of frauds but contends that the provisions thereof do not apply because the "purchase money" for the real estate was paid in full by his performance of the agreement, not to file his claim against the estate.

The statute of 29 Charles II, c. 3, known as the statute of frauds, was enacted in England in 1677 for the purpose of defeating the objectives of the frauds and perjuries prevalent at that time. It was drawn with the aid of some of the ablest judges, chancellors, and civilians of the time. It has been said that the courts of equity immediately set upon it, and by "judicial legislation", quite effectively drew the teeth of the statute. Moreland, the Statute of Frauds and Part Performance, 78 Am. Law Register 51 (Univ. of Pa., Nov. 1929). It is true that within ten years after its passage, an English Chancellor, Lord Jeffreys, decreed the specific performance of an oral contract for the sale of land, where the purchaser had been put in possession, and had tendered the purchase money. Butcher v. Stapely, 1 Vern. 363 (1685). The grounds for the decision being that the contract was executed. Such "judicial legislation", if it may be so called was not for the purpose of defeating the statute, but was to prevent the statute from being used as an instrument of, or as a shield for, fraud.

In construing the statute, not only with reference to the establishment of the contract, but also in connection with the "part performance" feature, "it is of first importance to remember that the statute is fundamentally a judge-inspired and judge-drafted statute". And further, "it is not enough to know the date and authorship of the statute and its main provisions. We must get more 'atmosphere' if we are to interpret the statute properly. The title of the statute 'An Act for prevention of frauds and perjuries,' and its opening words 'For prevention of many fraudulent practices, which are commonly endeavored to be upheld by perjury and subornation of perjury, be it enacted,' etc., tell us much. The prevention of perjury and subornation of perjury in connection with the groups of matters legislated about constituted the main purpose of the statute, and all its provisions are but the legislative means

toward such prevention. * * * It was not a statute aimed at judges but rather one intended to assist judges." George P. Costigan, Jr., Interpretation of the Statute of Frauds, 14 Illinois Law Review 1.

It was, in fact, a statute aimed at juries, because it was the character and the function of a jury, at that time, that it might decide on its own knowledge alone, and, if it heard evidence, might reject it all. Thayer, Preliminary Treatise on Evidence, 180.

While there was some question as to whether the statute was to apply to chancery cases, the chancery judges very sensibly accepted the statute, as the rule for chancery, as well as law, *except where part performance or other happenings would make the application of the statute in the given case against conscience.* Costigan, Date and Authorship of the Statute of Frauds, 26 Harvard Law Review 329, 345; Maitland, Equity, 240, 241; Jenks, Short History of English Law, 217; Browne, Statute of Frauds, 5th Ed., sec. 448; Roberts, Statute of Frauds, 3d Am. Ed., 131; Pomeroy, Specific Performance of Contracts, 3d Ed., 1926, sec. 103. Courts of equity, before the exceptions to the original statute were enacted, enforced these exceptions, under their general equitable powers, and gave as the reason for disregarding the statute in some cases, "that otherwise it would work a worse fraud than it was designed to prevent." Mundy v. Jolliffe, 1839, Eng., 5 Mylne & Craig 167; Malins v. Brown, 1850, 4 N. Y. 403; Hibbert v. Aylott's Unknown Heirs, 1880, 52 Tex. 530.

It appears that prior to the passage of the statute the courts of equity had required, as an essential to the enforcement of oral contracts for a creation or transfer of interest in land, that the plaintiff adduce proof that the contract had been partly performed, or that he had so changed his position on the faith of the agreement, that a denial of its enforcement would be a fraud upon him. Sugden, Vendors and Purchasers, 14th Ed., 152; Costigan, The Date and Authorship of the Statute of Frauds, 26 Harvard Law Rev. 329; 101 A. L. R. 932.

Any question concerning the power of the courts to engraft equitable exceptions upon the statute was removed by the legislature of Iowa, by the enactment of section 2411 of the Code of 1851.

The statute of frauds, so far as pertinent to this case, as it appears in the 1935 Code of Iowa, is as follows:

"11285. Statute of frauds. Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent: * * *

"3. Those for the creation or transfer of any interest in lands, except leases for a term not exceeding one year."

"11286. Exception. The provisions of paragraph 3 of section 11285 do not apply where the purchase money, or any portion thereof, has been received by the vendor, or when the vendee, with the actual or implied consent of the vendor, has taken and held possession of the premises under and by virtue of the contract, or when there is any other circumstance which, by the law heretofore in force, would have taken the case out of the statute of frauds."

The courts of today interpret and enforce the exceptions stated in section 11286, in the light of the principles announced and the procedure followed by the early courts of equity, as noted herein. As stated by the commentator, in 101 A. L. R. 935:

"The true basis of the doctrine of part performance, according to the overwhelming weight of authority, lies in the principles of equitable estoppel and fraud; it would be a fraud upon the plaintiff if the defendant were permitted to escape performance of his part of the oral agreement after he has permitted the plaintiff to perform in reliance upon the agreement." (Citing many cases.)

Or, as it is sometimes stated, "in an equitable action for specific performance founded upon part performance, 'the defendant is really "charged" upon the equities resulting from the acts done in execution of the contract, and not (within the meaning of the statute) upon the contract itself.' Maddison v. Alderson, 8 App. Cases 467 (1883) [Eng.]." Walter v. Hoffman, 267 N. Y. 365, 196 N. E. 291, 292, 101 A. L. R. 919.

The term "part performance" is a misnomer and inaccurate, in that many matters designated as such, are not, in fact, the performance or part performance of the contract, it-

self, but are those done pursuant to, or in reliance upon, the contract.

■ Another principle, which must always be kept in mind, is that the "part performance", the things done, or the matters claimed as consideration, must be unequivocally referable to the verbal contract. It has been well stated by the late Justice Cardozo, in Burns et ux. v. McCormick, 233 N. Y. 230, 234, 135 N. E. 273:

"Not every act of part performance will move a court of equity, though legal remedies are inadequate, to enforce an oral agreement affecting rights in land. There must be performance 'unequivocally referable' to the agreement, performance which alone and without the aid of words of promise is unintelligible or at least extraordinary unless as an incident of ownership, assured, if not existing.

" 'An act which admits of explanation without reference to the alleged oral contract or a contract of the same general nature and purpose is not, in general, admitted to constitute a part performance.' Woolley v. Stewart, 222 N. Y. 347, 351, 118 N. E. 847, 848.

"What is done must itself supply the key to what is promised. It is not enough that what is promised may give significance to what is done."

This court early announced this principle in Williamson v. Williamson, 4 Iowa (Cole) 279, 281:

"If a party would take a case out of the statute of frauds, upon the ground of a part performance, it is indispensable that the parol contract, agreement or gift should be established by clear, unequivocal and definite testimony; and the acts claimed to be done thereunder, should be equally clear and definite, *and referable exclusively to the said contract or gift*." (Italics ours.)

Also, in Sweeney v. O'Hora, 43 Iowa 34, 38, we said:

"If the acts relied upon are of a doubtful or equivocal character, and may have been done with other views than as part performance of an agreement, then they do not take the case out of the operation of the statute."

We have consistently followed this principle that the con-

tract must be established by proof that is clear, convincing and satisfactory, and the acts constituting performance must be equally plain, definite and referable exclusively to the contract. Houlette v. Johnson, 205 Iowa 687, 216 N. W. 679; Helmers v. Brand, 203 Iowa 587, 213 N. W. 384; Stennett v. Stennett, 174 Iowa 431, 156 N. W. 406; Chew v. Holt, 111 Iowa 362, 82 N. W. 901. As stated in In re Runnells' Estate, 203 Iowa 144, 154, 212 N. W. 327, 331, if the performance was referable to the verbal contract, ''it must be because the circumstances put in evidence permit no other rational hypothesis.''

 The purpose of the statute of frauds is to defeat the objectives of fraud and perjury, and to prevent the proof of the contracts mentioned in the statute, and the matters claimed as part performance, or as constituting consideration or purchase money, solely and only by ·mere words. This does not necessarily mean that the proof must always be some written evidence, but it must be either by writing, or by ·some tangible act or circumstance, clearly and definitely referable to the oral agreement, and pointing it out and. confirming it. Such tangible acts, as applied to real estate transfers, may be possession, possession and improvements, payment of consideration by cash or check, payment of taxes, or other acts commonly incident to ownership, or, as stated in Code section 11286, ''when there is any other circumstance which, by the law heretofore in force, would have taken the case out of the statute of frauds.'' If these tangible acts are shown, and they are, in and of themselves, referable to the verbal contract and consistent therewith, then parol evidence becomes competent to show the specific terms of the contract. And conversely, in the absence of proof of such tangible acts, parol evidence is not competent to prove the contract.

Nowhere have we found the principle better stated, than by Justice Cardozo, in Burns v. McCormick, supra, in the language following:

''Inadequacy of legal remedies, without more, does not dispense with the requirement that acts, and not words, shall supply the framework of the promise. That requirement has its origin in something more than an arbitrary preference of one form over others. It is 'intended to prevent a recurrence of the mischief' which the statute would suppress. Maddison v.

Alderson, supra, 8 L. R. App. Cas., at page 478. The peril of perjury and error is latent in the spoken promise. Such, at least, is the warning of the statute, the estimate of policy that finds expression in its mandate. Equity, in assuming what is in substance a dispensing power, does not treat the statute as irrelevant, nor ignore the warning altogether. It declines to act on words, though the legal remedy is imperfect, unless the words are confirmed and illuminated by deeds. A power of dispensation, departing from the letter in supposed adherence to the spirit, involves an assumption of jurisdiction easily abused, and justified only within the limits imposed by history and precedent. The power is not exercised unless the policy of the law is saved. Pound, Equity and the Statute of Frauds. 33 Harvard Law Review, 933, 944.''

██ With the historical background of the statute of frauds, and the purposes of its enactment, and the principles applicable as herein stated, in mind, let us apply them in the solution of the controversy before us. Notwithstanding the appellee denies that his claim for past performed services is an essential element in his case, save as a corroborative circumstance, the record quite clearly indicates that the real consideration for the alleged oral agreement, was the cancellation of this claim, and the discharge and satisfaction of the indebtedness which accrued by reason of those services. On page 5 of his brief and argument, filed January 3, 1939, he states:

''*By way of compromise and settlement of said claim*, William Henry James agreed with the plaintiff that if he would refrain from filing his claim against the Estate of Nan W. James, he would convey or devise to the plaintiff the real estate located at 215 South Johnson Street, Iowa City, Iowa.''

While the appellee earnestly contends that the real agreement, on his part, was simply to refrain from filing the claim, this, in its essence, conceding, arguendo, that the agreement was made, was nothing more than the method and manner which was adopted to extinguish the obligation.

██ It is true that past services or past indebtedness may be a lawful consideration for a promise, or an agreement, but this is very different from saying that by proving the services or the indebtedness, you can, by parol evidence, establish a con-

tract, by which the debtor agreed to sell and convey, or will to the creditor his horse, or automobile, or real estate, in satisfaction of the services or debt. If this could be done, one who hired services, or contracted debt, would always do so at the peril of having his creditor come into a court of equity and, by the usual method of evading the provisions of the ''dead man statute'', show, by oral testimony, that the debtor agreed to satisfy the debt by transferring to the creditor certain specified property. And at the further and more dangerous peril, that after his death, the creditor could come into court, and by the same methods show, by oral testimony, that the decedent had verbally agreed to convey or will to him a certain piece of property, in payment of the services or debt, and ask that the widow, heirs, or representatives of the estate be compelled to perform the agreement. Or to bring the hypothetical case more closely within the purview and terms of the appellee's claim, after the death of the debtor, the creditor could come into court and by the same methods show, by oral testimony, that prior to the decedent's death, the creditor had threatened to bring suit on the claim, and the decedent orally agreed that if he would refrain from bringing suit, he would deed or devise him certain real estate.

The statute of frauds has been enacted by every state to prevent the successful culmination of just such litigation as is referred to above, and in particular to prevent predatory prowling upon the estates of decedents, by such testimony.

To sustain the decree of the trial court would be to fly in the face of overwhelming authority, both in number and weight, and decisions of this court, squarely in point. For authorities of other jurisdictions, see annotated brief in the footnotes to Scott v. Mundy & Scott, 193 Iowa 1360, 188 N. W. 972, 23 A. L. R. 460, as reported in 23 A. L. R. 473 et seq., and the authorities cited in that case itself. In In re Estate of Runnells, Edith McIntosh v. Curtis, Executor, 203 Iowa 144, 153, 212 N. W. 327, 331, this court held that an oral contract for the conveyance of land is not taken out of the statute of frauds, by establishing a past and executed consideration. This was a case where the niece of the deceased prosecuted a claim against the estate on an alleged oral agreement with the deceased that, in consideration of services and kindnesses rendered to the deceased, prior to the agreement, and in further consideration of

her going with the deceased on a proposed trip to Florida, the deceased would convey or devise her a farm. Her action was in probate on the claim. She recovered judgment of $15,000 on a verdict of the jury. The only proof of the contract was a conversation between her mother and the deceased in which the claimant took no part. Both she and her mother testified to it. The conversation was in early 1919. Her pleading was that deceased promised to give her the farm in consideration of services *performed and to be performed* during a period of 13 years from 1908 to 1921. There was corroborative testimony of others, mostly of admissions of the deceased. Such testimony was circumstantial and inferential only, and was not direct or substantive evidence of the contract. It tended to prove nothing more than a purpose or promise on the part of the deceased to make a gift or devise, and would come within the prohibition of the statute of frauds. To make such evidence admissible at all, it was essential that she should prove the terms of a contract which had been partly performed by the claimant. The court held that the conversation between her mother and the deceased in her presence, in which she took no part, did not prove a contract between her and the deceased, and that if it did, proof of it was prohibited by section 11257.

We held that the only evidence remaining to escape the statute of frauds was the Florida trip, and this was too shadowy, more colorable, than real, more formal, than substantial. Respecting the past services as a consideration, Justice Evans said:

"But the alleged past services cannot avail to take the case out of the statute of frauds, nor to render admissible the evidence of the alleged promises of the decedent. Only performance subsequent to the alleged promise is available to that end. The question of subsequent part performance is, therefore, *vital* to the claimant's case. If she fails at this point, substantially all her evidence is rendered inadmissible, under the statute of frauds. Her former trips were not referable to the contract, nor were any former services rendered by her referable thereto. If it is to be said that the Florida trip was referable thereto, it must be because the circumstances put in evidence permit no other rational hypothesis. The proof, if any, is purely circumstantial."

So it is in the instant case. The services were all rendered

prior to the alleged agreement, and could not possibly be referable to it, since they could not have been done in the performance of, or pursuant to it, or on the faith of, or in the reliance upon, the performance thereof by James.

If we take the view of the appellee, that the contract, which he performed, was his agreement to not file his claim, what do we find? The performance which he claims, is, necessarily, that he did nothing, rather than something. He proves that he did nothing, by producing the clerk of court's records and files in the Mrs. James' estate, which disclose no claim filed by him. Can we say that the fact that no claim was filed by him is "exclusively referable" to his alleged oral agreement not to file? Can we say that it is "unequivocally referable to such agreement?" Can we say that it is reconcilable "with no other rational hypothesis?" We must answer all of these questions in the negative. His failure to file might be referable to a number of reasons. From the scant proof of any worth-while services performed, he may have concluded that he would not file. Because the services were for a sister, to whom he no doubt felt a fraternal obligation, he may not have filed. She had expressed a desire to do something for him. Perhaps she did, and for that reason he did not file. It is true that he testified that he did not file but this is surplusage, in view of the record testimony. As in the Runnells case, the proof, if any, is "purely circumstantial".

 Furthermore we are constrained to hold, in accord with the decision, and the principle announced in Scott v. Mundy & Scott, supra, and followed in Hagedorn v. Hagedorn, 194 Iowa 172, 188 N. W. 980, and Dunnick v. Hagedorn, 196 Iowa 1067, 195 N. W. 994, that where the performance of the verbal contract relied upon is the doing of nothing, as in not filing a claim against an estate in the office of the clerk of the court, there must be some written evidence of the agreement, as required by Code section 11285, or proof of some other tangible act or circumstance, other than the mere absence of the claim of record, definitely tending to establish that the absence of any such filed claim was because of the oral agreement. Any uncertainty could have easily been avoided by a written memorandum. The appellee had consulted the lawyer-witness Russell about this very matter. Russell was the attorney for the Mrs. James' estate, and for James, the executor. It is significant,

that though each had legal advice, and an attorney, at hand, the agreement was not evidenced in writing.

In Collins et al., v. Collins, 138 Iowa 470, 473, 114 N. W. 1069, 1070, one of the defendants in a quieting title action, by cross-petition, claimed title to a certain piece of ground, upon the following oral contract: The promisor said: " 'I have made up my mind to give you the Savanah farm *for what you have done for me,* if you will accept it.' " The promisee said: ". 'That will be satisfactory with me, uncle.' " (Italics ours.) There was further evidence that the promisee should come and take care of the promisor in case of his sickness. He took care of him for about ten days. In denying the relief, this court, through Chief Justice Ladd, said:

"The record has failed to convince us that, if deceased promised to convey the land, this promise was rescued from the operation of the statute of frauds by part performance."

In Scott v. Mundy & Scott, 193 Iowa 1360, 1371, 188 N. W. 972, 976, 23 A. L. R. 460, the plaintiff sought to recover his alleged interest in certain oil leases held by the defendant, and his share of dividends thereon paid to the defendant. He claimed that in September 1918, when the defendant partnership was indebted to him, he bought a half interest in the oil leases through his brother, who was a member of the defendant partnership, and paid for it by an agreement that the partnership should extinguish as much of its debt to him on its books, by crediting itself with the amount of the purchase price for his share of the oil leases. It was conceded that this agreement rested wholly in parol, and that no receipt, book entry, or written memorandum was ever made in regard to the same by either party, and that no part of the property or the dividends therefrom was ever delivered to the plaintiff, and that no act or thing was done between the parties, further than the mere oral agreement to discharge a pre-existing debt. The court held that this was insufficient to remove the bar of the statute of frauds, and that there was no competent evidence in the record to establish the sale or purchase of the interest in question.

This decision, written by Justice Faville and concurred in by Justices Evans, Stevens and Weaver, superseded a contrary holding on this issue in the opinion in that case in 186 N. W. 207.

The court said:

"The great weight of authority, in construing the statute of frauds, in so far as the same relates to the sale of personal property, is to the effect that the 'part payment' required to take an oral contract out of the provisions of the statute cannot be made by the mere oral agreement to discharge an existing indebtedness. The cases generally recognize that the actual discharge of an existing indebtedness is a sufficient 'part payment' to comply with the requirements of the statute of frauds, but that such discharge of an existing indebtedness must itself be evidenced by writing. In other words, a mere oral agreement to discharge an existing indebtedness does not comply with the requirements of the statute of frauds that part of the purchase must be paid. With great unanimity, the courts hold that, where such a discharge of an existing indebtedness is relied upon as part payment, the fact of the discharge must be evidenced in writing. This may take the form of a receipt or an entry in the books of account of the proper parties, or some written memorandum; but the discharge cannot rest wholly in parol."

Many cases are cited and quoted from, in the opinion, upholding the decision of the court.

In Hagedorn v. Hagedorn et al., 194 Iowa 172, 175, 188 N. W. 980, 981, we applied the rule of the Scott case to a verbal contract for the sale of real estate. There, suit was brought by the plaintiff to quiet title to 200 acres of land. Defendant pleaded that he had purchased the land by oral contract, and had entered into possession, and made improvements. Plaintiff replied that defendant's possession was under a lease, and that the alleged contract of purchase was void under the statute of frauds. The appellee was a son of the appellant. The appellee claimed that he lived on the farm as tenant for twelve years, and in 1918 he purchased the farm by oral contract from his father, in which it was agreed that the father owed him $1,000 for improvements and that this sum should be credited on the purchase price. The improvements were made while he was tenant.

There was no writing whatever executed to evidence the agreement, or the discharge of the indebtedness, nor was there any evidence that any entry was made in any book of account

or in any other manner respecting the same. In holding that the oral agreement was not sufficient to meet the requirement of the statute of frauds, under the holding in Scott v. Mundy & Scott case, the court through Justice Faville, said:

"We reaffirm the pronouncement made in the Scott case, and hold that the oral agreement between the vendor and vendee, to discharge a pre-existing debt as a part of the consideration for the purchase and sale of the real estate in controversy, is a sufficient part payment to comply with the conditions of the statute of frauds respecting the sale of real estate; but that, in order that the discharge of such pre-existing debt may be available as proof of part payment under the statute of frauds, such discharge must be evidenced in some manner by writing, so that it does not rest wholly in parol.

"Applying this rule to the instant case, there is an entire want of any written evidence whatever in regard to the discharge of the pre-existing debt. Therefore, there is want of legal proof of a payment of part of the purchase money, to meet the requirements of the statute of frauds."

In Dunnick v. Hagedorn, 196 Iowa 1067, 195 N. W. 994, the decisions in Hagedorn v. Hagedorn, and in Scott v. Mundy & Scott, were reaffirmed.

Under the above-mentioned authorities, it is our judgment that the appellee has failed to establish his case with evidence, of the weight and character required, and that the decree of the trial court cannot be upheld. The appellants have urged other grounds for reversal, but it will not be necessary to pass upon them.

However, the appellee has cited, and relies upon other decisions of this court, which he earnestly insists require an affirmance of the decree. If we consider only the language used in, and with reference to, some of these decisions, there is some warrant for what the appellee says, but if we scan these decisions a little more closely, and analyze the issues involved, and what was decided, and what was necessary for decision, little support is found for the appellee's contention, except in the latest of these cases. The matter is one of importance, and we owe it to parties in this case, to the trial court, to this court, and to our profession and to the public to clarify our decisions.

The cases relied upon by the appellee are Hotchkiss v. Cox,

47 Iowa 655; Kerr et al. v. Yager et al., 158 Iowa 69, 138 N. W. 905; Richardson v. Estle et al., 214 Iowa 1007, 243 N. W. 611; Dorr Cattle Co. v. Des Moines National Bank, 127 Iowa 153, 98 N. W. 918, 4 Ann. Cas. 519; Peake v. Conlan, 43 Iowa 297; and Northwestern Mut. Life Ins. Co. v. Steckel et al., 216 Iowa 1189, 250 N. W. 476.

We will refer to them in the order named.

In Hotchkiss v. Cox et al., 47 Iowa 655, 657, it appears that the plaintiff claimed to be the owner of an undivided fourth of certain lots in Oskaloosa, the title to which stood in Seth Cox. The plaintiff was the remarried widow of Amos Cox, a deceased son of Seth Cox. Amos Cox became the owner of an undivided half of the lots by an exchange with his father. Amos died intestate, without issue. Plaintiff in this suit asked that Seth Cox be decreed to deed to her the one-fourth interest. The defendant claimed that Amos was indebted to him at the time of the exchange, and it was a part of the trade that Amos was to secure him by a mortgage on the property conveyed to him. The amount of the indebtedness was ascertained, but the giving of the mortgage was postponed. Finally it appears that both Amos and the plaintiff agreed to relinquish their interest in consideration of the indebtedness, "and in consideration of the expenses which Amos' father was incurring for him in the sickness which terminated in his death." Seth Cox testified that the reason Amos gave for never executing the mortgage was that it was not worth while in view of the continual expense that he was to his father. He also testified that Amos and the plaintiff told him that they had been thinking the matter over and that the amount they were owing him was so much that they had given up all claim to the lots. The opinion states that there was no evidence that the plaintiff relinquished her claim in writing. Neither does the opinion disclose just how Seth Cox obtained title to the property, although he had title at the time of the trial. The plaintiff and Amos occupied the property only about six months.

The court said:

"It is insisted by plaintiff, however, that a parol agreement would not in any event be sufficient to divest their interest in the property. But if the plaintiff and her husband agreed to relinquish their interest in the property in consideration of the

discharge of the plaintiff's husband's indebtedness to his father, and in consideration of his expense to his father in his last sickness (and the evidence shows that the father took his son in his last sickness into his house and kept him until he died), it appears to us that the agreement, although resting in parol, was valid.''

It will be noted that the consideration of the parol agreement to convey was not only the promise of the purchaser to discharge the pre-existing indebtedness of the seller, but was, also, and in addition, his promise to care for and pay the existing and future expense of the seller's sickness. This the purchaser did. This latter part of the consideration was part payment of the purchase price of such character that it took the transaction out of the statute of frauds, and permitted parol proof thereof. There are numerous decisions of this court holding that the promise to perform services in the future becomes a sufficient consideration to take the contract out of the statute of frauds, if the services are thereafter performed.

The record of the above case in this court shows that on October 14, 1867, the plaintiff and her husband Amos deeded an eighty acres in Madison county to Seth for an undivided half interest in the Oskaloosa lots, which Seth was to convey to Amos, and the latter was to give a mortgage back thereon to Seth for indebtedness owing the latter. Amos was then an invalid with consumption. Amos and wife moved onto the lots and in March 1868, because of their indebtedness to Seth and because the expense of his future care, relinquished their interest in the lots, surrendered possession, and moved into Seth's home not long after, where Amos and wife were cared for until the death of Amos August 26, 1869. The deed to Amos and the mortgage back were never executed.

Kerr et al. v. Yager et al., 158 Iowa 69, 74, 76, 138 N. W. 905, 907, was a suit to partition real estate. The defendants Yager and Yager claimed to be the owner through transfers from James H. House, deceased, from whom all parties claimed title. A decree dismissing the plaintiff's petition and quieting title in Yager and Yager was affirmed. The defendants Yager and Yager claimed title through Allen House, to whom they claimed James H. House had sold and transferred the property, by oral contract, and who thereafter took possession of the land,

improved it and paid taxes on it, and deeded it to them. These defendants also claim title by adverse possession, and allege extensive improvements. Plaintiffs, in reply, denied generally and pleaded the statute of frauds. The primary and pivotal question in the case was: Did James H. House sell the land by oral agreement to Allen, and did the latter go into possession? Allen had previously cleared all of the land of saw lumber, sawed and sold it, and gave the money to James H. House, his father. There was evidence that the father then said to Allen, "I will give you this land if you will take it and pay taxes on it for what you have done for me in clearing it off." Allen accepted the proposal and performed all conditions of the offer, by taking possession and paying the taxes until he sold it to the Yagers. The court, through Justice Deemer, said:

"Such being the testimony, we do not think it is open to the objection that it is within the statute of frauds. See Hotchkiss v. Cox, 47 Iowa 655. Aside from this, *it was not objected to on that ground,* and for that reason the objection was waived. Holt v. Brown, 63 Iowa 319, 19 N. W. 235; Crossen v. White, 19 Iowa 109, 87 Am. Dec. 420; Graves v. Clark, 101 Iowa 738, 69 N. W. 1046.

"The satisfaction and release of a pre-existing debt is a sufficient consideration for a conveyance and amounts to such payment as to take the case out of the statute of frauds. See the Hotchkiss case, supra. If Yagers' case depended upon a parol gift, which must, to be sufficient, be followed by actual possession, if not by the making of improvements thereon, we should have more difficulty with it. But, as the conveyance was made in consideration of the son's past services, we think the agreement was something more than a gift. It was a transfer upon a consideration paid, and such acts of possession and ownership as followed are confirmation of the claims made by the Yagers."

It will be noted that the vendee, under the oral agreement of purchase, took possession of the land, and made some improvements on it, and made some use of it. The fact that he took possession, under his contract, brought the transaction within the exception to subdivision three of the statute of frauds, and took the transaction out of the statute. Furthermore the opinion says the "satisfaction and release" of a pre-existing

debt, and there is nothing to indicate that the "satisfaction and release" were not evidenced in writing. It also appears that no objection was made that the testimony was barred by the statute of frauds. The case of Hotchkiss v. Cox also is not authority for any holding that the discharge of a pre-existing debt in itself amounts to such payment as to take a case out of the statute of frauds. What is said in that connection is dictum.

Richardson v. Estle et al., 214 Iowa 1007, 1015, 243 N. W. 611, 615, was a suit in equity to establish priority of plaintiff's judgment lien over a warranty deed given to the defendant Estle, as grantee, by the debtors, under plaintiff's judgment. The debtors were E. M. Rex and wife. Mrs. Rex was a daughter of Estle. He had signed notes with Rex and wife, as guarantor or surety, in excess of $22,000. The debtors were insolvent and Estle would have the entire debt to pay. He had already paid two of these notes. Mrs. Rex had an undivided one-sixth interest in 425 acres of land in Muscatine county which she had inherited from her mother. Her father had his distributive share therein which had never been set off. He was at all times, pertinent to the case, in possession of all of the land. A verbal agreement was entered into by Estle and Mr. and Mrs. Rex that he would purchase her interest in the land, and pay for it by crediting the purchase price on her indebtedness to him. It was agreed that Mr. and Mrs. Rex should execute the deed and mail it to the recorder at Muscatine, with instructions to him to file and record the deed and then send it to Estle. Rex and wife lived at Grinnell and Estle at Dallas Center. The deed was executed on December 31, 1927, and put in the mail to the recorder on January 5th. Plaintiff filed his transcript of judgment in Muscatine county on January 6th, and claimed priority for his lien. Estle received the deed, and paid the consideration thereof by canceling and delivering to Mrs. Rex her three notes for $2,000, $3,000 and $7,000, which Estle had paid to their holders, as surety. The interest in the real estate conveyed by Mrs. Rex was valued at $3,200. Thereafter, and on July 31, 1928, plaintiff served notice of this action. The trial court dismissed the plaintiff's action and this decree was affirmed, upon the ground that Mrs. Rex had parted with title when she contracted to sell, which was a few days before the deed was executed. The burden was upon the plaintiff to prove

affirmatively that the deed had not been delivered prior to January 6, 1927. He failed to do this. However, since Mrs. Rex had parted with her beneficial ownership in the property when she made the contract of sale, it was wholly immaterial whether the deed was delivered before or after January 6th. But, in any event, the delivery of the deed was made when it was put in the mail at Grinnell on January 5th. The court, through Justice Evans, said:

"Let us suppose that the deed had *not* been deposited in the mail, but had become lost. Would such a circumstance become fatal to the property rights of Estle? The precedent contract was complete. The grantor had already received the consideration in a practical sense. The grantee was already in possession. The oral contract was valid and was therefore enforceable. It was not within the statute of frauds [Code 1931, §11285]. So we held in Kerr v. Yager, 158 Iowa 69, 138 N. W. 905. It was there held that a parol contract for the transfer of real estate in consideration of the extinguishment of existing indebtedness was an enforceable contract and was not within the statute of frauds. It had been so held in Hotchkiss v. Cox, 47 Iowa 655, and again in Dorr Cattle Company v. Des Moines National Bank, 127 Iowa 153, 98 N. W. 918, 102 N. W. 836 [4 Ann. Cas. 519]."

What the court said about the statute of frauds was wholly unnecessary to a decision of the case and was dictum. The only question involved was a question of lien priority, and that depended on the validity of the Estle contract. Its validity did not depend on the statute of frauds, since that statute does not affect the validity of contracts, but has to do only with evidence of their proof. Gilbert v. Plowman, 218 Iowa 1345, 256 N. W. 746; Bader v. Hiscox, 188 Iowa 986, 174 N. W. 565, 10 A. L. R. 316. No defense or objection was based on the statute. It was not in the case. Furthermore the purchaser was in possession at all times and his possession after the contract was referable to it. Also the purchaser paid the consideration by the cancellation of the notes evidencing the indebtedness and delivering them to the vendor, all of which removed the transaction from the statute, had it been involved.

In Peake v. Conlan, 43 Iowa 297, the horse trade was taken out of the statute of frauds by its complete execution and de-

livery of the property, under the statute of frauds, as found in sections 3663 and 3664 of the Code of 1873. The question of the proof of the discharge was not discussed or apparently involved.

In Dorr Cattle Co. v. Des Moines National Bank, 127 Iowa 153, 98 N. W. 918, 4 Ann. Cas. 519, the question under discussion was not involved. It was claimed by the plaintiff that there was an oral agreement with the bank to satisfy the plaintiff's indebtedness to it, by a conveyance of real estate, and the plaintiff claimed that the conveyance was consummated by delivery of the deed to and its acceptance by the officer of the bank designated in the agreement. This took the transaction out of the statute of frauds. See Gilbert v. Plowman, 218 Iowa 1345, 256 N. W. 746; note 51 L. R. A. (N. S.) 78.

Northwestern Mutual Life Ins. Co. v. Steckel, 216 Iowa 1189, 250 N. W. 476, was an action at law, on a promissory note, to recover judgment for a deficiency owing thereon after the foreclosure of a mortgage securing the indebtedness. The defense was an oral agreement by which it was claimed the liability of the defendants was settled. The trial court refused to admit proof of the agreement by oral testimony. Judgment was reversed.

The plaintiff held the defendants' note for $15,000 secured by a mortgage on Missouri land, due October 16, 1930. About ten days before maturity of the note, the defendant, W. J. Steckel, proposed to Swacker, the loan agent of the plaintiff at St. Louis, and the trustee in the mortgage, that the mortgagors would deed the farm to the plaintiff in full satisfaction of the indebtedness. Swacker submitted the proposal to his superiors, and its assistant counsel wrote to the defendants that unless the indebtedness was paid at maturity, foreclosure proceedings would be begun. Steckel then went to the home office of plaintiff, at Milwaukee, and was directed at the information desk to see Mr. Price, who informed him that Swacker was better informed about the matter than were they at Milwaukee, and he should see and deal with Swacker. Price wired Swacker to hold up proceedings until Steckel could see him. On November 3, 1930, Steckel saw Swacker and renewed his original offer, which the latter said the company would not accept, but stated that if Steckel would deed the land to the company, and pay it $750, the company would accept the same in full settlement

of the obligation. Steckel told Swacker that he would accept the proposal and would pay the $750 December 1, 1930, and give the deed, with possession, February 15, 1931, all as agreed. This offer and acceptance were entirely oral, and evidenced by no writing whatsoever. On December 15, 1930, Swacker wrote the defendants a letter, which was introduced in evidence, stating in substance, that Mr. Hughes left a letter with the writer, written by the Steckels, under date of December 11, 1930, together with a bank draft for $751.75 payable to the company's order, and a special warranty deed, executed by the Steckels to the company. The letter further stated, ''As I reported to you on November 20th, this matter was submitted to our Finance Committee and they declined to accept your proposition. I am, therefore, returning herewith'' the deed and draft.

On December 20, 1931, Swacker, as trustee, foreclosed the mortgage, and the land was sold at foreclosure sale for $14,000, leaving a deficiency of $1,998.56, for which this action was brought. The defendants admitted the execution of the note, pleaded the settlement, and tendered performance. They offered to prove the settlement, herein set out, by the oral testimony of Steckel, which the court refused. Judgment was given plaintiff on a verdict directed by the court on plaintiff's motion. This court held that Swacker had authority from the plaintiff to make the settlement. Judgment was reversed because of the trial court's refusal to admit the Steckel testimony, as to the oral agreement. We said:

''The other ground urged by the appellee is that the agreement of settlement relied upon by appellants is within the statute of frauds (Code 1931, section 11285) and could not be established by parol evidence.

''In the case of Hotchkiss v. Cox, reported in 47 Iowa 655, on page 657, this court said: [setting out the quotation from the same case which we have herein set out].

''Again we find the question before this court in the case of Kerr v. Yager, reported in 158 Iowa 69, 138 N. W. 905. On page 76 of 158 Iowa, 138 N. W. 905, 908, this court said: [setting out the same quotation which we have inserted herein]''

Further continuing, the court said:

''In other words, the consideration had been paid by past

service, for which the grantor-promisor was indebted to the grantee-promisee. Therefore, the promise to convey was merely a conveyance in return for a consideration which had already been paid, the existing debt. In the case at bar the agreement was to convey and pay a certain sum of money in consideration of the existing indebtedness by Steckel to the appellee company. Following the reasoning set out in the Kerr v. Yager case, the company had paid the consideration; therefore the contract is not within the statute of frauds. This court, speaking through Justice Evans, in the case of Richardson v. Estle, reported in 214 Iowa 1007, on page 1016, 243 N. W. 611, 615, said:

" 'The oral contract was valid and was therefore enforceable. It was not within the statute of frauds. * * * So we held in Kerr v. Yager, 158 Iowa 69, 138 N. W. 905. It was there held that a parol contract for the transfer of real estate in consideration of the extinguishment of existing indebtedness was an enforceable contract and was not within the statute of frauds. It had been so held in Hotchkiss v. Cox, 47 Iowa 655.'

"Thus, under the decisions of this court, an agreement to convey real estate in consideration of a pre-existing indebtedness is valid and not within the statute of frauds. This is because of the fact that the purchase price in such cases had, for all practical purposes, been paid by the grantee. There is nothing left to be done except to make the formal credits or releases. We therefore come to the conclusion that in the case at bar the statute of frauds did not apply; that the lower court erred in not permitting the testimony which was offered; and that the judgment of the lower court must be, and it is hereby, reversed, and this cause remanded."

It will be noted that in this case the question was put squarely up to the trial court and to this court, whether the discharge of a pre-existing debt, as a part of the consideration for the purchase and sale of real estate, could be established by testimony wholly in parol. We held that it could be done. We did so upon the authority of Hotchkiss v. Cox, Kerr v. Yager, and Richardson v. Estle, all of which are cited herein. As we have pointed out herein, none of these cases can be regarded as authority for the proposition stated, as whatever was said in any of those cases in support thereof, was not warranted by the facts and was dictum. Our decision in the Steckel case is

contrary to our holdings in Collins v. Collins, In re Estate of Runnells, Hagedorn v. Hagedorn, Scott v. Mundy & Scott, and Dunnick v. Hagedorn, all referred to in this opinion, and to Parker v. Coe, 200 Iowa 862, 205 N. W. 505, and is contrary to the great weight of authority. 23 A. L. R. 473. See Montpelier Sav. Bank & Trust Co. of Vermont v. Follett et al., 68 Neb. 416, 94 N. W. 635, and Starin v. Newcomb et al., 13 Wis. 519, where it is directly held that an oral agreement between the owner and a mortgagee of real estate that the latter shall accept a deed of the owner in full satisfaction of the mortgage debt is within the statute of frauds.

The fact that the draft for $750 and the warranty deed were mailed to the plaintiff cannot, of course, be considered as a payment or as a delivery of the deed. Both were promptly returned. In Ormsby v. Graham, 123 Iowa 202, 217, 98 N. W. 724, 730, we said:

"A tender of performance presupposes a contract already complete in its terms and conditions. It cannot be treated as in itself a part performance to take the contract out of the statute of frauds."

The discharge of a pre-existing mortgage indebtedness is a sufficient consideration for a sale of the land to the mortgagee, and may be considered as purchase money, or a portion thereof, under the 1935 Code, section 11286, but that does not mean that an agreement that such a discharge was the consideration for a transfer of an interest in land may be established solely by parol evidence.

Under the authority of the Steckel case, in every action to foreclose a real estate mortgage, or to recover a deficiency on the note after foreclosure sale, the mortgagor or maker could allege that the mortgagee orally agreed to satisfy the mortgage indebtedness by accepting a deed to the mortgaged premises, and establish it by oral testimony. This ought not be the law. It would completely evade section 11285 of the Iowa Code, respecting the creation or transfer of any interest in lands, and be contrary to our previous interpretations of the statutory exceptions thereto.

The decisions in the first five of these cases are right, but none of them are authority for the proposition that an oral contract, for the transfer of an interest in lands, can be estab-

lished solely by parol evidence that the debtor-vendor agreed to sell or convey his real estate interest in consideration of the satisfaction of a claim for pre-existing services against him, or of the discharge of a past or pre-existing indebtedness owing by him. The decision in Northwestern Mutual Life Ins. Co. v. Steckel et al., 216 Iowa 1189, 250 N. W. 476, is such authority, and it is our judgment that it is not sound law, and is contrary to the prior decisions of this court.

It is therefore the judgment of this court that the decree appealed from herein, and all provisions thereof adverse to the appellants, be reversed, and it be remanded to the trial court for entry of decree in accordance herewith.

It is further ordered that any language or any decision in any of the cases last above mentioned, contrary to our holdings herein should be and is overruled.—Reversed and remanded.

SAGER, HALE, OLIVER, MILLER, and HAMILTON, JJ., concur.

MITCHELL, C. J., dissents.

\* \* \*

MITCHELL, C. J. (dissenting)—I find myself unable to agree with the majority and therefore respectfully dissent.

The opinion consists of thirty-one pages; five pages stating the facts and parts of the pleadings and twenty-six pages in a learned but unnecessary discussion of the statute of frauds. Unnecessary because the question of the statute of frauds is not the decisive one.

I quote from appellants brief and argument.

"As already pointed out the plaintiff's claim is based on an alleged oral contract by decedent to convey the real estate in question to the plaintiff. The consideration is founded upon an alleged agreement by the plaintiff to cancel and refrain from filing an alleged claim that plaintiff held against the decedent and his wife for services in caring for the latter during her last illness. \* \* \*

"There is no question but that proof of part payment of the consideration takes the contract out of the operation of the statute of frauds. It may be readily conceded that where a claim is based upon an oral contract to convey real estate in consideration for services *to be performed in the future,* the rendition of such services is sufficient performance or payment

to satisfy the requirements of the statute and no writing is required.''

And a little later on in his brief appellant says:

''But such cases are of no help to the appellee in the present situation. In the instant case, the alleged oral agreement did not call for any act or services to be performed by the plaintiff in the future and no act was in fact performed. The agreement contemplated a *mere failure to act*. The difference of course is fundamental, both upon reason and authority.''

''The reason underlying the exception to the statute of frauds based upon 'payment of the purchase price' or 'part performance' is that where one of the parties has done some act by way of performance, then the proof of the contract does not rest upon mere words alone. There is then something definite that can be tied to; words of the witness are corroborated by some act that is established; and consequently there is less likelihood of perjury and bringing of false and unfounded claims. The performance of services by one party for another certainly gives rise to the inference that they must have been performed pursuant to some contract, understanding or agreement, but in our case a mere failure to act is equally consistent with the non-existence of any claim at all or the existence or non-existence of any oral agreement.''

I turn now to appellee's theory of his case.

''The appellee is not relying in any way upon services rendered prior to the date of the agreement sought to be enforced to constitute part of the performance or payment such as would take the case out of the Statute of Frauds. Appellee is relying upon the fact that he performed his part of the agreement by forebearing to file his claim for services after the agreement was entered into.''

''The averments in plaintiff's petition concerning the performance of the services by him and the agreement of testate to pay for same are not more than a recital of the inducements which led the Plaintiff and Testator, James, to enter into the contract which is sought to be enforced herein and must be distinguished from the consideration for the performance of the oral agreement. Clayman v. Bibler, 210 Iowa 497 at 501, 231 N. W. 334. And so we say that the cases cited by Appellants

in regard to future and past services have no applicability to this case.''

''Appellants attempt to argue the proposition that where an agreement for the cancellation of an existing indebtedness owed by decedent to claimant for alleged past services is relied upon to constitute part performance or part payment, that in order to take the case out of the Statute of Frauds there must be some writing such as a receipt or written credit to evidence such fact. As above stated, Appellee does not rely upon the performance of services to constitute the performance of his part of the contract.''

I quote now from appellee's reply to amendment of appellant's amended brief and argument.

''The argument in Appellants' Brief and Argument is directed to the Statute of Frauds. Permit us to say that the case of Groh v. Miller, 196 Iowa 367, 195 N. W. 259, and Bader v. Hiscox, 188 Iowa 986, 174 N. W. 565, 10 A. L. R. 316, were cited in Appellee's original Brief and Argument for the sole purpose of supporting his contention that a contract such as the one sued upon, though in parol when it has been performed by one of the parties, will be enforced in equity. (Appellee's original Brief and Argument, p. 8 et seq.) They were not cited for any other purpose at that time. While they refer to The Statute of Frauds, it was not our intention and we did not enter into any discussion of the Statute of Frauds at that time. They were cited under the general proposition that 'The procedure pursued by Appellee is authorized by statute.' (Appellee's original Brief and Argument, p. 8; also Argument of Proposition 1 on p. 9.).''

There is no dispute between the parties as to the statute of frauds, nor the many cases that this court has handed down covering this important subject.

The appellee claimed that he performed certain services, nursing and caring for his sister, Nan James, with the understanding that he would be paid therefor. That he demanded payment for these services after her death from her husband, W. H. James, the main beneficiary of her estate, and that if his services were not paid for, appellee would file a claim against her estate. He claims that W. H. James promised that if appellee

would not file a claim against the wife's estate, he (W. H. James) would convey to appellee certain described real estate. That appellee performed his part of the agreement by not filing a claim against the Nan James' estate. The records of that estate were introduced which showed he did not file a claim. The main contention of both parties, as I read the record, is whether there was sufficient evidence to support appellee's contention, and whether or not the failure to file a claim was part performance on appellee's part so as to escape the statute of frauds. Instead of deciding the case upon the theory upon which it was tried and passed upon by the lower court, the majority found it necessary to spend considerable time in an unfavorable discussion of the case of Northwestern Mutual Life Insurance Co. v. Steckel, 216 Iowa 1189, 250 N. W. 476.

It is interesting to note that the able and distinguished counsel who represented both sides of this case did not rely on the Steckel case.

This is an equity case and appellee filed the first brief. The Steckel case is not cited. It is not even mentioned. Appellants filed brief and argument consisting of 57 pages; again I find that the Steckel case was not cited, not even mentioned. Appellees filed a reply brief consisting of 43 pages; the Steckel case was not cited, it was not mentioned. And so we find that in the briefs and arguments that this court under its rules allows, neither side cited or mentioned the Steckel case. On the morning the case at bar was orally argued in this court, the appellants filed contrary to the rules of this court what they call an amendment to appellants' brief and argument consisting of five and one-half pages. For the first time the Steckel case is mentioned. Do they say that it should be overruled; that it is contrary to this court's former opinions? So that there can be no question as to the appellants' position in regard to the Steckel case, I quote from their amended brief:

"In Northwestern Mutual Life Insurance Co. v. Steckel the action was brought to recover upon a promissory note a deficiency remaining after the foreclosure of a real estate deed of trust in the state of Missouri. The defense was that before the commencement of foreclosure proceedings the mortgagor made an oral agreement with the agent of the plaintiff insurance company, by the terms of which the defendant agreed to execute a

deed of the farm to the mortgagee and to pay in addition the sum of $750.00, and that in consideration therefor the mortgagee agreed to cancel and release the indebtedness. The record showed that pursuant to this agreement the mortgagor executed a deed to the premises and delivered it to the agent of the mortgagee and also delivered to said agent a check for $750.00. The agent acknowledged receipt of the deed and check, but returned both and foreclosed the mortgage.

"It is submitted that the execution and delivery of the deed and check for $750.00 constituted complete performance of the oral agreement by the defendant and such performance was clearly sufficient to take the case out of the statute of frauds, and there was no occasion or necessity for the court to discuss the sufficiency of the cancellation of an existing debt as consideration or part performance.

"In other words, there was more in the Steckel case than simply an agreement to cancel the note and mortgage in return for other acts to be done by the mortgagors. The evidence went further and showed that the defendant had fully performed his part of the agreement by delivering the deed and actually paying the money."

Appellee then filed what he designates as "Appellee's Reply to Amendment of Appellant's Brief and Argument", and for the first time the appellee mentions the Steckel case. I quote:

"We think this case is in harmony with the well established rule in this state, that is, that when the purchase price has been paid or Plaintiff has shown performance of his part of the contract, the case is not within the Statute of Frauds."

Thus I find that neither side relied on the Steckel case, that it was not even cited in the briefs permitted by the rules of this court, so naturally I am surprised in view of such a record to discover that the majority find it necessary to overrule that decision.

But is the Steckel case out of line with the former decisions of this court?

In Hotchkiss v. Cox, 47 Iowa 655, this court said:

"If the plaintiff and her husband agreed to relinquish their interest in the property in consideration of the discharge of the plaintiff's husband's indebtedness to his father, and in

consideration of his expense to his father in his last sickness (and the evidence shows that the father took his son in his last sickness into his house and kept him until he died), it appears to us that the agreement, although resting in parol, was valid."

In the Hotchkiss case, there was no writing that the pre-existing debt was discharged; all of the evidence as to part performance of the consideration was oral.

In the Steckel case, the question was whether the oral agreement to deliver the deed and the draft of $750 was admissible. The lower court refused to admit it, this court reversed the case. In the Steckel case there was a delivery of a deed and a draft of 750 some dollars, in accordance with the agreement made. In other words there was part performance, as there was in the Hotchkiss case.

In Kerr v. Yager, 158 Iowa 69, 138 N. W. 905, the consideration was the agreement to discharge pre-existing indebtedness for services in clearing up the premises and paying taxes. It was all based on parol evidence.

In the case of Dorr Cattle Co. v. Bank, 127 Iowa 153, 98 N. W. 918, 4 Ann. Cas. 519, the question was over the delivery of a deed, the same proposition as involved in the Steckel case. The claimed agreement was based on oral evidence, there was no written evidence. In the Dorr case the parol evidence was admitted and in the Steckel case this court said it should have been admitted. In my judgment one would have to use a pretty fine microscope to find any distinction between the cases.

The late Justice Evans, who for twenty-five years served with distinction as a member of this court, wrote the opinion in the case of Richardson v. Estle, 214 Iowa 1007, 243 N. W. 611. Again it is the question of delivery of a deed, based purely upon parol evidence; no written evidence of any kind, and the delivery was to the post office not to the party claiming the agreement, and this court held it did not come within the statute of frauds.

I quote from the opinion in the Richardson case.

"The oral contract was valid and was therefor enforceable. It was not within the statute of frauds [Code 1931, §11285]. So we held in Kerr v. Yager, 158 Iowa 69, 138 N. W. 905. It was there held that a parol contract for the transfer of real estate in consideration of the extinguishment of existing indebt-

edness was an enforceable contract and was not within the statute of frauds. It had been so held in Hotchkiss v. Cox, 47 Iowa 655; and again in Dorr Cattle Co. v. Des Moines Bank, 127 Iowa 153, 98 N. W. 918, 102 N. W. 836 [4 Ann. Cas. 519]."

The majority cite the case of Scott v. Mundy & Scott, 193 Iowa 1360, 188 N. W. 972, 23 A. L. R. 460, and state that the Steckel case is contrary to that decision. With this I cannot agree. I quote from Judge Faville's opinion, 193 Iowa at page 1374, 188 N. W. at page 978, 23 A. L. R. 460:

"Applying this rule to the instant case, it follows that the oral agreement claimed to have been entered into between Ray Scott and Ralph Scott at the fair grounds, whereby an undivided interest in the oil lease referred to is claimed to have been sold for a consideration resting solely on a parol agreement to discharge a pre-existing debt, was within the provisions of our statute of frauds, and the objections of the appellant to the oral testimony to establish such agreement should have been sustained. It is conceded on all hands that this agreement rested wholly in parol; that no receipt, book entry, or written memorandum was ever made in regard to the same by either party; that no part of the property was ever delivered; that none of the dividends or other proceeds derived from the property were ever turned over to the appellee; *nor was any other act or thing done between the parties, further than the mere oral agreement to discharge a pre-existing debt.*" (Italics ours.)

Thus we find that in the Scott v. Mundy & Scott case, there was a mere oral agreement to discharge a pre-existing debt and *"No other act or thing was done between the parties"*, while in the Steckel case the deed was executed and sent to the insurance company together with the draft. Keep in mind that in the Steckel case, the lower court refused to admit the oral evidence of the agreement while in the Dorr Cattle case and Richardson v. Estle it was admitted.

It is interesting to note that Justice Stevens joined in the Scott v. Mundy & Scott opinion and that he also concurred in the Steckel opinion. For seventeen years he was a distinguished member of this court, he did not believe that the Steckel case was contrary to the Scott v. Mundy & Scott, in which he concurred and he was familiar with both opinions.

The majority say "Under the authority of the Steckel case, in every action to foreclose a real estate mortgage, or to recover a deficiency on the note after foreclosure sale, the mortgagor or maker could allege that the mortgagee orally agreed to satisfy the mortgage indebtedness by accepting a deed to the mortgaged premises and establish it by oral testimony."

The Steckel opinion was written in 1933. There have been more foreclosures in the past six years than at any time in the history of Iowa, but no case has come to this court relying on the Steckel case. The same argument could have been made against the opinion in all of the cited cases. I can see no reason why an insurance company has a right to go back on an agreement to take back a piece of land, where the agreement is carried out by the delivery of the deed and draft as in the Steckel case. The statute of frauds was not passed for that purpose and this court has so held from the Hotchkiss case down to the Steckel case.

I readily admit the writer of the opinion in the case of Northwestern Mutual Life Insurance Co. v. Steckel, 216 Iowa 1189, 250 N. W. 476, might have been mistaken in his interpretation of what our former decisions meant, but it is interesting to note that that opinion was concurred in by the then Chief Justice Albert and Justices Stevens, Anderson and Kintzinger and there was no dissent.

This court as it is now composed has a right to change the rule and overrule its former decisions but it should say so frankly, rather than claim that these eminent jurists, who through the years have cited these cases as laying down certain rules of law, were not warranted in doing so, and that what they relied upon was mere dictum.